**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

DONALD PEVIA,                              *

Plaintiff                                  *

v                                          *          Civil Action No. ELH-18-1553

HOLLY PIERCE, *et al*.,                    *

Defendants                                 *
                                          ***

## MEMORANDUM OPINION

Donald Pevia, a self-represented Maryland prisoner confined at the North Branch Correctional Institution ("NBCI"), filed suit under 42 U.S.C. § 1983 against Holly Pierce, RNP, and Ava Joubert, M.D., alleging denial of constitutionally adequate medical care. ECF 1. Defendants have moved to dismiss, or, in the alternative, for summary judgment. ECF 9. The motion is supported by a memorandum (ECF 9-3) (collectively, the "Motion") and several exhibits. Plaintiff opposes the Motion (ECF 13) and has submitted exhibits. Defendants replied. ECF 15.[1]

No hearing is necessary to resolve the Motion. Local Rule 105.6 (D. Md. 2018). For the reasons that follow, defendants' Motion, construed as one for summary judgment, shall be granted.

## I.     Factual Background

A. Plaintiff's allegations

---

[1] Defendants move to strike (ECF 17) plaintiff's surreply (ECF 16, docketed as a motion to supplement and amend), claiming it is an unauthorized filing. Plaintiff opposes defendants' motion, arguing that the surreply is simply a supplement/amendment to his opposition response. ECF 18 (docketed as a motion to deny).

Defendants correctly argue that a surreply is not permitted under Local Rule 105.2, unless authorized by the court. I shall grant plaintiff's motion to supplement and amend (ECF 16); deny defendants' motion to strike (ECF 17); and grant plaintiff's motion to deny (ECF 18).

In his unverified complaint, plaintiff alleges that he has a history of severe shoulder and knee injuries, both necessitating surgical repairs. Throughout 2016 and 2017 he was prescribed multiple pain medications and muscle relaxers, including Baclofen and Tramadol, due to these injuries. ECF 1 at 2; ECF 13 at 10; ECF 13-1 at 12. In this case, plaintiff's complaint centers on his allegations that his prescriptions for Tramadol and Baclofen were improperly discontinued in November of 2017 and January of 2018, respectively, and that he was not provided proper pain medication during this time.

Plaintiff indicates that on November 3, 2017, he was transferred to Western Correctional Institution ("WCI"). ECF 1 at 2. At that time, Dr. Joubert began to reduce plaintiff's prescription for Tramadol. *Id*. Plaintiff disagreed with Joubert's decision to discontinue his prescription for Tramadol because he continued to suffer from chronic arthritis in his knee and shoulder as well as "deteriorating joint disorder." *Id*. at 7. Plaintiff advised Joubert "that Tylenol and Mobic did nothing when Joubert advised [him] to buy these things from commissary." *Id*.[2] Plaintiff also advised Joubert that he was indigent and had no money with which to buy medication and that the medical department could not deny him medication and then make him pay for it. *Id*.

Joubert told plaintiff that medical was not required to provide over-the-counter medications that were available in the commissary. *Id*. Plaintiff states he was unable to buy medication from the commissary and "was forced to buy pain med[ication] from other inmates by doing tattoos and making jailhouse liquor." *Id*.; *see also* ECF 13 at 2 (in response to a sick call slip seeking pain

---

[2] In his opposition, plaintiff also claims that he told Joubert that he did not take the Mobic because it was "a minor anti-inflammatory and caused [his] stomach to ache." ECF 13 at 2. He also states that as a person who has been treated for Hepatitis C his liver could still be damaged by medications. He claims that aspirin and Tylenol damage the liver. *Id*.

medication, Joubert advised plaintiff to buy it from the commissary, resulting in plaintiff buying blister packs of Motrin from other inmates.)

Plaintiff's prescription for Baclofen was continued. ECF 1 at 3. But, on December 21, 2017, plaintiff submitted a sick call slip complaining that he had not received all of the pain medication that Dr. Joubert had ordered for him and that since his prescription for Ultram/Tramadol ended he wanted to be prescribed something. He indicated his shoulder and knee were in terrible pain and that his prescription for Baclofen was also about to expire. ECF 13 at 2. Joubert wrote on the sick call slip: "addressed on 11/14/17 order from commissary only." *Id*. Plaintiff states that the Mobic and Tylenol that were prescribed to him were never received by him due to the prison's policy that he purchase it from the commissary. ECF 13 at 6-7. Further, he explains that he was unable to purchase medication from the commissary because he was indigent during the relevant time frame. *Id*. at 7-8

On January 11, 2018, plaintiff's prescription for Baclofen expired. Nevertheless, he maintains that he continued to receive the medication because the medical department failed to remove him from the pass list. ECF 1 at 3; *see also* ECF 13 at 3; ECF 13-1 at 6 (pass list indicating plaintiff went to medication call twice daily from January 11, 2018 to January 21, 2018).

Plaintiff was transferred to NBCI on January 21, 2018. Once there, he stopped receiving Baclofen. ECF 1 at 3. After a few days, plaintiff began to experience side effects and withdrawal from not receiving Baclofen. *Id*. On January 28, 2018, he submitted a sick call slip indicating that he needed to be seen by medical staff about his pain medication. He stated that since he had been "cut off" he could not sleep, and suffered cramps, nausea and terrible pain. ECF 13-1 at 7.

A few days later, plaintiff was seen by Holly Pierce, RNP. During the visit, plaintiff and Pierce argued due to Pierce's refusal to renew plaintiff's prescription for Baclofen to assist him in

handling the withdrawal. ECF 1 at 3. Plaintiff states that he later found out Pierce fabricated the report of the encounter, claiming that Baclofen withdrawal was never discussed. *Id*. Plaintiff claims that he suffered withdrawal from Baclofen because he was suddenly denied the medication. *Id*. In support of his contention, he provides printouts from a website indicating that Baclofen should be tapered, and warning against abrupt stoppage. ECF 13 at 10; ECF 13-1 at 9, 11. Plaintiff also provided an affidavit from inmate Shawn Campbell, who avers that in December of 2016, Holly Pierce stopped his prescription for Baclofen via a tapering dose for him and explained to him that the dose needed to be tapered in order to avoid withdrawal symptoms. ECF 13-2 (Campbell Affidavit) at 1. Campbell also indicates that he is "aware of the withdraw[al]s [plaintiff] went through," but does not describe them, and also indicates that plaintiff suffered a loss of appetite. *Id*., p. 1.

B. Defendants' response

In support of their Motion, defendants submitted various exhibits, including the affidavits of Asresahegn Getachew, M.D.; Holly Pierce, RNP; and relevant portions of plaintiff's medical records from November 1, 2017 through June 25, 2018. ECF 9-4 (medical records); ECF 9-6 (Pierce Affidavit); ECF 9-5 (Getachew Affidavit).

Plaintiff's has a history significant for Hepatitis C Virus, hypertension, shoulder pain/dislocation, and left knee pain. ECF 9-5 at ¶ 3.

Relevant to the allegations raised in this case, on November 14, 2017, plaintiff was evaluated by Ava Joubert, M.D. ECF 9-4 at 2-4. The history of plaintiff's left knee pain and treatment was reviewed. It was noted that plaintiff underwent surgery on June 19, 2017, to repair a torn ACL. *Id*. at 2. His recovery from the surgery was uneventful until on or around July 30, when his cellmate fell on plaintiff's left knee. *Id*. On August 9, 2017, plaintiff was observed

walking without difficulty, his upper and lower extremities were within normal limits, and no swelling, bruising, or limping were noted. *Id.* Plaintiff failed to appear for a scheduled provider visit on August 22, 2017. On September 7, 2017, he reported to his physical therapist that his knee was improving, and he was discharged to self-management. *Id.* Thereafter, plaintiff complained of continuing left knee pain and an x-ray, taken on November 9, 2017, showed mild degenerative joint disease. *Id.*

At the encounter with Joubert, plaintiff expressed his displeasure that his prescription for Tramadol/Ultram (a narcotic-like pain reliever used to treat moderate to severe pain) was being discontinued. *Id.* Joubert explained to plaintiff that narcotic analgesics were not intended for long term use. *Id.* He was encouraged to take his Mobic[3] for pain relief but plaintiff advised that he did not use it. *Id.* Joubert entered a prescription for two months of acetaminophen and a tapering dose of Tramadol. *Id.* at 2-4, 19, 21.

Dr. Getachew and Pierce both explain that the Department of Public Safety and Correctional Services' State Medical Director has identified Tramadol (a synthetic opioid) "as a medication with patterns of overuse and abuse." ECF 9-5, ¶ 7; ECF 9-6, ¶ 8. The patterns of abuse include hoarding of these medications by inmates or for trade to other inmates for misuse in exchange for secondary benefits. *Id.* And, Tramadol may be habit-forming with long term use. ECF 9-5, ¶ 8; ECF 9-6, ¶ 9. When Tramadol is taken with alcohol or products containing alcohol, Tramadol can also slow one's heart rate and lead to brain damage. *Id.* Additionally, misuse or abuse of Tramadol can lead to overdose and death. *Id.* In recent medical studies, Tramadol was shown to be no better than placebos and worse than other available narcotics. *Id.* As such,

---

[3] Mobic (meloxicam) is a nonsteroidal anti-inflammatory drug (NSAID) used to treat arthritis and reduces pain, swelling and stiffness of the joints. *See* https://www.webmd.com/drugs/2/drug-18173/mobic-oral/details (last visited May 22, 2019).

Getachew and Pierce each aver that Tramadol was not clinically indicated for plaintiff's medical condition. Getachew avers that it was appropriate to wean plaintiff off his prescription for Tramadol. ECF 9-5, ¶ 8.

At the time plaintiff was weaned from Tramadol, he had active prescriptions for Mobic, Baclofen, and aspirin, which all expired on January 11, 2018. ECF 9-4 at 21, 23. Dr. Getachew explains that Baclofen is a muscle relaxer used to relieve muscle cramping and spasms. ECF 9-5, ¶ 6. Baclofen is not a drug used for long term pain management and as such it was not clinically indicated to treat plaintiff's condition. *Id*.; *see also* ECF 9-6, ¶¶ 4, 10 (Baclofen not recommended for long term use).

Pierce avers that Baclofen is not a narcotic and that the FDA does not have a recommendation requiring its tapering when it is discontinued. ECF 9-6, ¶ 4. Cessation of Baclofen can cause withdrawal effects, usually when it is administrated by spinal injection. *Id*. The withdrawal symptoms include high fever, muscle stiffness, and changes in mental status which occur within 2-48 hours after the last dose and typically peak within 72 hours. *Id*.

On January 21, 2018, plaintiff was transferred from WCI to NBCI. ECF 9-4 at 5, 8. A week later, on January 28, 2018, plaintiff submitted a sick call slip complaining about his pain medications. *Id*. at 9. He explained that he suffered from cramps, nausea, and pain, which he attributed to the cessation of his pain medications. *Id*.

Pevia was seen by Pierce on February 2, 2018. *Id*. at 10-11. Plaintiff demanded a prescription for Ultram/Tramadol and Baclofen. *Id*. Pierce reviewed plaintiff's orthopedic notes. *Id*. Plaintiff voiced his disagreement with the notes and told Pierce that he would get a court order for Ultram/Tramadol and Baclofen. *Id*. He also advised Pierce that he was not interested in physical therapy or other treatment plans. *Id*. At the time of the encounter, plaintiff did not

complain to Pierce of withdrawal effects from Baclofen. ECF 9-6, ¶ 7. As Pierce attempted to explain to plaintiff the clinical indications for the use of Ultram/Tramadol and Baclofen, he began to yell, and "[t]he visit was stopped for safety concerns." ECF 9-4 at 10. Plaintiff's prescriptions for Ultram/Tramadol and Baclofen were not renewed. *Id*. at 10-11, 18.

Pierce avers that restarting Baclofen was contraindicated and not clinically indicated. ECF 9-6, ¶ 7. Dr. Getachew and Pierce each state that non-pharmacologic therapy and non-opioid pharmacologic therapy are the preferred courses of treatment recommended by the Center for Disease Control for treatment of chronic pain. ECF 9-5, ¶ 9; ECF 9-6, ¶ 11. Plaintiff's prescriptions for aspirin, Mobic, and extra-strength Tylenol were all renewed. ECF 9-4 at 10, 25. Notably, Dr. Getachew avers that Mobic, which is not an over-the-counter medication, was provided to plaintiff at no cost. ECF 9-5, ¶ 10.

Plaintiff was scheduled to be seen in the chronic care clinic on March 11, 2018, but did not attend. ECF 9-4 at 12. It was noted that he had been seen out in the recreation yard. *Id*.

Plaintiff submitted sick call slips on April 16 and 20, 2018, seeking copies of his medical records. *Id*. at 13-14.

Pierce evaluated plaintiff in the chronic care clinic on June 25, 2018. *Id*. at 15-16. At that time, plaintiff reported that he had not taken his prescribed blood pressure medication for 2-3 months because he did not have it. *Id*. at 15. Plaintiff advised that he tried to exercise daily. *Id*. He offered no complaints regarding chronic pain. *Id*.

Dr. Getachew explains that the policy of NBCI and WCI is that inmates may purchase over-the-counter medications, such as Tylenol or other NSAIDs, from the commissary. ECF 9-5,

¶ 11. When an inmate demonstrates that he is indigent and unable to purchase any commissary items, the medications will be prescribed even if they are available at the commissary. *Id*. ¶ 12. [4]

## II. Standard of Review

The defendants' Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 Fed Appx. 220, 222 (4th Cir. 2016) (per curiam). But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6)

---

[4] Dr. Getachew incorrectly reported that plaintiff was not indigent because he was employed as a sanitation worker. ECF 9-5, ¶ 12. Defendants subsequently agreed that this was an erroneous statement; plaintiff was not employed. ECF 15, ¶ 7.

motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

Summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011); *see Putney v. Likin*, 656 Fed. Appx. 632, 638 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)); *see also Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 Fed. App'x 552, 561 (4th Cir. 2015).

To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). "[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011)

(alteration in original) (citation omitted).  A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874-75 (4th Cir. 2019); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 479 (4th Cir. 2018); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir. 2008), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"  *Harrods,* 302 F.3d at 244 (citations omitted).  But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.  And, a court "should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit.  *Id.* (internal citations omitted).  According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'"  *Id.* at

244-45 (internal citations omitted); *see also Putney*, 656 Fed. Appx. at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). "This is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 Fed. Appx. at 638.

Plaintiff has not moved for discovery in response to the dispositive Motion. And, he has submitted exhibits with his opposition. As such, I am satisfied that it is appropriate to address defendants' Motion as one for summary judgment, because this will facilitate resolution of this case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.; *see Sharif v. United Airlines, Inc.,* 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d

514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). And, the court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002); *see Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

Notably, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

In sum, to counter a motion for summary judgment, there must be a genuine dispute as to material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). "A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law." *Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).

### III. Discussion

### A.

Section 1983 of Title 42 of the United States Code provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 135 S. Ct. 1983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S.

823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

Section 1983 also requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). In other words, there is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

**B.**

The Eighth Amendment to the Constitution prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.

In general, the deliberate indifference standard applies to cases alleging failure to safeguard the inmate's health and safety. This includes failure to protect inmates from attack, maintaining

inhumane conditions of confinement, and failure to render medical assistance. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017).

The deliberate indifference standard consists of a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97-98 (quoting *Farmer*, 511 U.S. at 834, 837-38). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure the needed care was available. *Farmer*, 511 U.S. at 837; *see Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care).

A "'serious ... medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)). Proof of an objectively serious medical condition, however, does not end the inquiry. The subjective component requires a determination as to whether the defendant acted with "a sufficiently culpable state of mind." *Wilson*, 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40.

In order "[t]o show an Eighth Amendment violation, it is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178. In other words, deliberate indifference requires a showing that the defendant disregarded a substantial risk of harm to the prisoner. *Young v. City of Mt. Ranier*, 238

F.3d 567, 575-76 (4th Cir. 2001).  As the *King* Court reiterated, 825 F. 3d at 219: "The requisite state of mind is thus 'one of deliberate indifference to inmate health or safety.'" (citation omitted). Although this "'entails more than mere negligence ... it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Id.* (quoting *Farmer*, 511 U.S. at 835).

The subjective component requires "subjective recklessness" in the face of the serious medical condition.  *See Farmer*, 511 U.S. at 839-40; *see also Anderson v. Kingsley*, 877 F.3d 539, 544 (4th Cir. 2017).  "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997).  As the *Farmer* Court explained, reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837.  Therefore, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

Notably, deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.; Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it ... [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences ... To

lower this threshold would thrust federal courts into the daily practices of local police departments."). Therefore, mere negligence or malpractice does not rise to the level of a constitutional violation. *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986) (citing *Estelle v. Gamble, supra*, 429 U.S. at 106). And, "[t]he right to treatment is . . . limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added). Moreover, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842). In other words, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk . . . ." *Brice*, 58 F.3d at 105.

In *Scinto*, the Fourth Circuit said, 841 F.3d at 226:

A plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official ... had been exposed to information concerning the risk and thus must have known about it...." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in original)

(internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842 114 S.Ct 1970). Similarly, a prison official's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

Even if the requisite subjective knowledge is established, however, an official may still avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)); *see also Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016).

A delay in providing medical treatment may constitute deliberate indifference. *Smith v. Smith*, 589 F.3d 736, 739 (4th Cir. 2009) (citing *Estelle*, 429 U.S. at 104-05). The plaintiff must show, however, that the delay in providing medical care caused him to suffer substantial harm. *See Webb v. Hamidullah*, 281 Fed. Appx. 159, 166, 2008 WL 2337608 * 6 (4th Cir. 2008). Substantial harm can be shown by "lifelong handicap; permanent loss, or considerable pain." *Shabazz v. Prison Health Servs. Inc.*, 2011 WL 3489661, at * 6 (E.D. Va. 2011) (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001); *see also Coppage v. Mann*, 906 F. Supp. 1025, 1037 (E.D. Va. 1995).

## C.

The evidence, viewed in the light most favorable to plaintiff, establishes that he received constitutionally adequate medical care. As to plaintiff's complaints regarding Dr. Joubert, there is simply nothing in the record to establish that she acted with deliberate indifference to plaintiff's serious medical needs. To the contrary, she stopped plaintiff's prescription for Tramadol based on

concerns over its long-term use and lack of clinical efficacy for his condition. In doing so, she provided a tapering dose to mitigate plaintiff undergoing withdrawal.

Plaintiff's central complaint as to Joubert seems to be his contention that he never received the other pain medications that Joubert prescribed on November 14, 2017, *e.g*. Mobic and Extra Strength Tylenol. It appears that only Tylenol was required to be purchased via the commissary. Dr. Getachew avers that Mobic was provided to plaintiff without cost, but plaintiff chose not to take the medication. Moreover, Tylenol, not Mobic, is listed on the medication list available for purchase through the commissary. See ECF 13 at 1.

Significantly, at plaintiff's encounter with Joubert on November 14, 2017, when they discussed discontinuation of the Tramadol/Ultram prescription, plaintiff advised Joubert that he did not take his prescribed Mobic. He did not say that he had not received the prescription. Rather, according to plaintiff, he told Joubert that the medication did not help relieve his pain and it upset his stomach. Although that information is not reflected in the encounter note, the notes do indicate that Joubert encouraged plaintiff to continue taking Mobic, and she also prescribed Tylenol.

Plaintiff filed a sick call slip on December 21, 2017, over a month after his encounter with Joubert, stating that he had not received the medications she prescribed and needed something for pain. But, he did not indicate which pain medication he was referencing. At that time, plaintiff's medical records indicated he received or was receiving Mobic, Baclofen, and aspirin.

In fact, plaintiff does not dispute that he continued to receive Baclofen and aspirin. Moreover, plaintiff did not say in his sick call slip, or in any other documents before the court, that he was indigent and could not purchase over-the-counter medications from the commissary.

Based on plaintiff's medical records and the apparent availability of over-the-counter analgesic medications, there is simply no indication that Joubert was aware that plaintiff did not

in fact have access to analgesic pain medication. When viewing the evidence as a whole and in the light most favorably to plaintiff, no evidence exists that Joubert's alleged conduct amounted to deliberate indifference. *See Estelle*, 429 U.S. at 105-06 (holding that an inadvertent failure to provide adequate medical care does not amount to deliberate indifference). Threefore, Joubert is entitled to summary judgment.

Pierce is also entitled to summary judgment. Although the parties dispute whether plaintiff's prescription for Baclofen should have been tapered rather than abruptly stopped, Pierce's conduct regarding plaintiff's Baclofen prescription does not show deliberate indifference. Plaintiff's prescription for Baclofen was allowed to expire while plaintiff was housed at WCI, and plaintiff does not suggest that Pierce had anything to do with the discontinuation of the prescription for Baclofen.

It is undisputed that plaintiff's prescription for Baclofen expired on January 11, 2018. He does not explain how the prescription expired or whether he asked for the prescription to be renewed while he was at WCI. It is clear, however, that Pierce was not responsible for stopping the medication. As such, even if the Baclofen should have been tapered, as plaintiff alleges, it was not Pierce who caused the prescription to lapse. Therefore, she had no responsibility for the cessation of Baclofen.

Plaintiff maintains that, despite the expiration of his prescription, he nevertheless continued to receive Baclofen. He has provided a pass list which shows that from January 11 to January 21, 2018, he went to medication call twice daily, and he contends that at each medication call he received Baclofen. The pass list does not indicate what medication plaintiff received during those encounters, and the court observes that plaintiff had other active prescriptions during that time period.

Assuming that plaintiff did in fact receive Baclofen during that time period, due to an oversight at WCI, it remains undisputed that a review of plaintiff's medical records when he appeared for sick call on February 2, 2018, indicated he had not been taking Baclofen for over three weeks, a period well outside the time period for withdrawal. Additionally, while plaintiff's sick call form indicated he was suffering withdrawal symptoms, at the time of the encounter with Pierce, the contemporaneous records indicate that plaintiff complained generally of pain associated with his chronic conditions—not from withdrawal. Even if plaintiff were suffering from withdrawal symptoms at the time of the medical exam on February 2, 2018, there is nothing in the record that indicates that restarting Baclofen would have been the proper course of treatment. To the contrary, Pierce avers that restarting Baclofen was not clinically indicated at that time.

When viewing the evidence as a whole and in the light most favorably to plaintiff, no evidence exists that the conduct alleged amounted to deliberate indifference on behalf of Pierce. Indeed, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970)). No exceptional circumstances exist here. Pierce is entitled to summary judgment.

### IV. Conclusion

For the foregoing reasons, defendants' Motion will be GRANTED and judgment will be entered in favor of defendants and against plaintiff. A separate Order follows.

May 31, 2019                                    /s/
Date                                    Ellen L. Hollander
                                    United States District Judge